# CHARLESTON.

WARD MEADOWS *v.* J. H. McCULLOUGH *et al., Partners, etc.*

(No. 5519)

Submitted February 23, 1926.    Decided March 2, 1926.

HOSPITALS—*Employee of Corporation Which Contracted for Hospital Service for Injured Employees for Consideration Paid by Them, Suing Hospital for Fees for Services Paid to Another Hospital, Has Burden to Prove That Defendant Did Not Furnish Him Necessary Professional Treatment Contemplated by Contract and Ordinarily Furnished at Hospitals of Like Kind and Character in Same Community Acting Under Like Circumstances, and That Such Failure Was Not Result of Plaintiff's Act (Code, c. 71, § 2).*

Where a corporation has entered into a contract with a hospital to furnish its employees with necessary hospital treatment, in case of injury to them while in the course of their employment, for a consideration paid by each of said employees, and an employee so injured sues in assumpsit said hospital, as for a breach of such contract, relying on section 2, chapter 71, Code, for fees for hospital services rendered to him in treatment of his injury by another hospital, the burden is upon him to prove that the defendant hospital did not furnish to him such necessary professional treatment in the said hospital, contemplated by the contract, and as is ordinarily furnished at hospitals of like kind and character in the same community, acting under like circumstances; and, further, that such failure was not the result of the act of the plaintiff.

(Hospitals, 30 C. J. § 30.)

(Note: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Raleigh County.

Action by Ward Meadows against J. H. McCullough and another, partners operating the Beckley Hospital. Judgment for plaintiff, and defendants bring error.

*Reversed and remanded.*

*McGinnis & McGinnis,* for plaintiffs in error.
*Carl C. Sanders* and *C. M. Ward,* for defendant in error.

WOODS, JUDGE:

From a judgment of the circuit court of Raleigh county, on the verdict of a jury awarding plaintiff $315.00 damages, in an action of assumpsit, the defendants prosecute this writ of error.

The testimony discloses substantially the following state· of facts: The two defendants (physicians and surgeons) are and have been for a number of years the owners and operators of a general hospital in the City of Beckley, known as the Beckley Hospital; that as such owners and operators, some years prior to this action, they entered into a contract with the Beckley Coal & Coke Company, a corporation, engaged in mining and shipping coal; that by said contract they agreed to accept into said hospital and treat the employees of said corporation, who became ill or were injured in the mine, and for said hospital services and treatment the corporation assessed each of its employees $1.00 per month, which amount was deducted from the earnings of said employees and paid to defendants by said corporation monthly. The plaintiff in this case was an employee of the corporation, and had been for some months prior to his injury hereinafter stated, and had paid to the coal company the said $1.00 per month in the manner above set forth.   On the 7th day of June, 1923, about two o'clock, P. M., the plaintiff was seriously injured in the coal mines of said corporation while engaged in his duties as brakeman, having been caught between the bumpers of the cars and mashed through his hips and pelvis.   He was immediately conveyed to the defendant hospital, where he was received, treated and operated on, some of the broken bones removed and his wounds dressed. He remained and was treated there for about thirty hours, when he was removed by his father and friends to the King's Daughters' Hospital and there treated until he recovered and was discharged.   He paid for the services received at the last mentioned hospital $315.00.   The action here is to recover said amount so paid on the ground of breach of his contract with the defendant corporation hereinbefore mentioned, under the authority of § 2, Ch. 71, Code.

The declaration consists of two counts. In each, after a recital of the injury and the duty of the defendant hospital under its contract, the breach thereof is set out in these words:

"In violation of their agreement with this plaintiff (said hospital) then and there refused to receive this plaintiff into said hospital, and to give or furnish to him there or at any other place, their professional services as such physicians and surgeons, even necessary in order that this plaintiff's life might be saved, and thereupon, it became and was necessary for this plaintiff then to be received, cared for and treated by a physician and surgeon in some other hospital of like kind and character in order that he might not lose his life as the result of said injuries."

Then follows the recital of his removal to the King's Daughters' Hospital, his treatment there, and the expense entailed because of such service.

The defendants insist that the refusal of the hospital to receive this plaintiff is the gravamen of the breach. That inasmuch as the fact that he was received and treated therein is uncontroverted in the proof, that the court should have directed a verdict for the defendant. It will be seen that in addition to the last mentioned allegation, each count contains the charge that the defendant hospital then and there refused "to give or furnish to him there or at any other place, their professional services as such physicians and surgeons, even necessary in order that this plaintiff's life might be saved, etc." The case was tried on this latter theory of the breach of the contract, as the one instruction given by the court on behalf of the plaintiff shows. We are unable to see any merit in the defendants' restricted interpretation of the breach. It would be exceedingly technical to so construe it. This leaves for consideration the defense interposed that the evidence does not support the verdict.

The issue is narrowed down to whether the defendant hos-- pital gave and furnished to the plaintiff such professional services, while in such hospital, and necessary professional treatment, as was ordinarily furnished and as implied in the contract, at hospitals of like kind and character in the same

community, under like circumstances? The learned court in effect so instructed the jury. This is in substance the true test. *Dye* v. *Corbin,* 59 W. Va. 266; *Lawson* v. *Conaway,* 37 W. Va. 159; *Kuhn* v. *Brownfield,* 34 W. Va. 252. It is an admitted fact that he was received in the defendant hospital and remained there for thirty-six hours. According to the physicians and nurses, who are uncontradicted, his temperature on arrival there was 96°, nearly 3° below normal. He was bleeding profusely and was in an. extremely shocked condition. He was put in the first room that could be gotten into.. The hemorrhage was controlled by heavy dressing at that time. He was given morphine with stimulants applied, and it was two hours before he could be gotten in condition to be operated on. The physicians felt that if he were taken to the operating room at once and given a general anaesthetic he would die. The pelvis was crushed. Part of the bones jabbed out through the skin, and there was a wound on the right side which admitted the physician's hand when he was in the operating room. Through this opening a great many pieces of broken and crushed bone were removed. Strips of packing made out of gauze were used to stop the hemorrhage. The urethra was torn, not entirely in two, but partially. He was catheterized on the table and he was put to bed. He was admitted at two-thirty o'clock and taken to the operating room at four thirty. Ether was administered, the operation performed, and the patient was removed from the operating room at five o'clock. His condition was very serious. The stimulant was kept up. He was catheterized the next morning. He passed very little urine as he had little to pass. His kidneys had bled and were shocked. He was catheterized, and the next afternoon (Friday) the physicians failed to get a catheter inserted. A trocar to cut with was tried. The plaintiff showed the mark of this operation to the jury when he .testified. The plaintiff was removed from the defendant hospital about eight o'clock, Friday evening. This removal is sought to be justified by a conversation that an uncle of the injured man claims to have had just about dark (Thursday) with one of the doctors at the hospital. This witness went

there to learn of his nephew's condition.  He stated that the doctor told him: "He is hurt bad.  He is going to die.  There is nothing we can do for him."  Both physicians at the hospital deny this conversation.  The witness got in touch with the plaintiff's father, who arrived at the hospital about four o'clock, Friday evening.  The father testified that Dr. McCollough told him that his son could not live and that they had done "all they could for him."  He thereupon caused plaintiff to be removed to another hospital.

The physicians at the other hospital upon making an examination of plaintiff found his bladder was much distended.  They tried to pass a catheter but were unsuccessful.  They then tried to pass a sound and were unable to do that.  Patient was then given an anaesthetic and the bladder opened from above, and a large amount of water was taken therefrom.  They said that this was just the ordinary treatment that could be furnished at the Beckley Hospital.  They saw the mark in the median line, which was the proper place, where there looked like there had been a trocar passed with the idea of entering the bladder in that way.  Dr. Wheeler said that the bladder was not being drained at that time and that he felt that the treatment that was given him under his direction was proper and necessary.  It relieved the patient at once.  He eventually recovered.  On the other hand, Dr. Tieche of the Beckley Hospital says that at five or six o'clock, about two hours before plaintiff's removal from their hospital, that he tried to pass a catheter again and was unable to do it, and with a local anaesthetic then tried to pass a trocar above the symphysis in the bladder to relieve it in that way.  He was unable to do it.  He further states that at the time plaintiff was removed from the hospital that he was making preparation for emptying the bladder by opening up below.  Dr. McCullough corroborates Dr. Tieche as to the foregoing, and makes the statement: "We would have done exactly the same as he (Dr. Wheeler) had done, which was perfectly proper, if he had not been removed from the hospital.  That condition did not arise until that afternoon."  Physicians testifying both for the plaintiff and defendants seem agreed that after

the bladder is distended much beyond its usual content that there is a loss of sensation of pain, and that it is before it reaches this condition that there is suffering. Both Dr. Wheeler and Dr. Jarrel say that Ward was suffering greatly when he was brought into their hospital. This would tend to show that there was not an over distention of the organ. Dr. McCullough stated that an entry to relieve the bladder may be made in two ways: one in the abdomen and the other between the legs; that while either is proper, a cut should not be made into a person's bladder unless it cannot be drained by any other method. This same witness said that he did not tell the uncle and father that the boy had no chance to live, and further: "He (plaintiff) was in a very serious condition and I did not think he would get well. As far as that was concerned, the chances were against him." Even Dr. Wheeler admitted, when Ward first came to his hospital, that "there was nothing certain about whether he was going to recover." Both defendant physicians say that plaintiff was given proper treatment while under their care. Can we say on this state of facts that the defendant hospital has breached its contract? A hospital conducted for private gain, of course, is liable to its patient for injuries sustained by him in consequence of incompetency or negligence of a physician treating him at its instance, under a contract to furnish him proper treatment. *Vaughan* v. *Memorial Hospital,* 100 W. Va. 290; 130 S. E. 481. The law is, in such treatment a physician is not required to exercise the highest degree of skill and diligence possible, in the treatment of an injury, unless he has by special contract agreed to do so. He is only required to exercise such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing, in similar localities and in the same general line of practice, regard being had to the state of medical science at the time. Where he exercises ordinary skill and diligence, keeping within recognized and approved bounds, he is not liable for a mere mistake of judgment. *Dye* v. *Corbin, supra; Wurdemann* v. *Barnes,* 92 Wis. 206; *Sims* v. *Parker,* 41 Ill. A. 284; *Bonnet* v. *Foote,* 47 Colo. 282; *Staloch* v. *Holm,* 100 Minn. 276.

We are satisfied that the distracted father was prompted by good intentions in causing the removal of his son to another hospital. Whether the statement of the physician to him be as he understood it or not, at best it voiced only the opinion of the physician. It is a matter of common knowledge that the wisest and most skillful practitioners in medicine and surgery are often mistaken in diagnosis. The use of the trocar after this conversation shows the fact to be that there was a continuation of effort to relieve the patient by the Beckley Hospital physicians. According to the physicians an incision into the bladder for drainage purposes should be resorted to only when all other means fail. Can we say from the record that the Beckley Hospital would not have accorded to the plaintiff the same treatment as he received in the hospital to which he was later removed? The physicians in charge of the former say that they were preparing to do just what was done by Dr. Wheeler of the King's Daughters' Hospital, but that their plans were frustrated by his removal. Who says they were not? Dr. Wheeler, a man of unquestioned ability in his profession, does not say so. As a fair, high-minded man, he only tells the simple story of what he did do in the way of treating the plaintiff after he came under his charge, and the result of said treatment. When asked if the same treatment could not have been furnished at the Beckley Hospital, the Doctor answered in the affirmative. Thus upon the vital question here—the failure to give plaintiff proper treatment under its contract—the record is silent. It is the only ground upon which a recovery may be had. It cannot be left to the jury to find a verdict on mere conjecture.

Our conclusion is that the court should have directed a verdict for the defendant.

*Reversed and remanded.*