465 S.E.2d 628

**Osa GOOCH, Executrix of the Estate of John Earl Gooch, and Osa Gooch, Individually, Plaintiff Below, Appellant**

v.

**WEST VIRGINIA DEPARTMENT OF PUBLIC SAFETY; Trooper S.B. Lake; and Raleigh General Hospital, a West Virginia Corporation, Defendants Below, Appellees.**

No. 22806.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 31, 1995.

Decided Nov. 17, 1995.

Monty L. Preiser, Robert P. Welsh, Preiser Law Firm, Charleston, for appellant.

Steve McGowan, Luci R. Wellborn, Joanna Tabit, Steptoe & Johnson, Charleston, for appellees West Virginia Department of Public Safety and Trooper S.B. Lake.

W.H. File, Jr., File, Payne, Scherer & File, Beckley, for appellee Raleigh General Hospital.

CLECKLEY, Justice:

The plaintiff below and appellant herein, Osa Gooch, as Executrix of the Estate of John Earl Gooch and individually, appeals the August 1, 1994, order of the Circuit Court of Raleigh County that denied her motion to reconsider the circuit court's prior order dated April 19, 1994, to the extent that order ruled on the motion for summary judgment made by Raleigh General Hospital (hospital), one of the defendants below and an appellee herein. The April 19, 1994, order granted the hospital's motion for summary judgment and dismissed the plaintiff's action against it. The April 19, 1994, order also denied a motion for summary judgment made on behalf of the other defendants below and appellees herein, Trooper S.B. Lake and the West Virginia Department of Public Safety (DPS). The plaintiff asserts that the circuit court erroneously granted summary judgment in favor of the hospital because she presented a genuine issue of fact to be resolved by a jury. In their brief, Trooper Lake and the DPS make a cross-assignment of error alleging the circuit court wrongfully denied their motion for summary judgment in the April 19, 1994, order.

## I.

### FACTS AND PROCEDURAL BACKGROUND

On June 12, 1992, the plaintiff filed a wrongful death action[1] against the defendants. Mr. Gooch died on June 17, 1990, of strep pneumonia. Four days prior to his death, on June 13, 1990, Mr. Gooch went to Dr. William Stout's office in Hopewell, Virginia, for treatment of a respiratory illness. In his deposition, Dr. Stout stated Mr. Gooch complained of a persistent cold and cough. After examining him, Dr. Stout found Mr. Gooch had a temperature of 101.4 degrees, "rhonchi on both sides [of his lungs], and some rales in the lower part of his lungs[.]"[2] Dr. Stout testified that rales indicate the "beginning of an infection in the chest and the lungs.... You get that sometimes in early pneumonia[.]" From his records, Dr. Stout believed Mr. Gooch suffered from severe bronchitis and was probably on the verge of developing pneumonia. Dr. Stout gave Mr. Gooch an injection of penicillin and vitamin B12 and a prescription for penicillin tablets. On a scale of one to ten, with one being least severe and ten being most severe, Dr. Stout rated Mr. Gooch's condition as a three.

The next day, June 14, 1990, Mr. Gooch was driving on Interstate 77 in Raleigh County, West Virginia, towards his home in Kentucky. Trooper Lake was operating radar on Interstate 77 that day when a motorist stopped and told him that he passed Mr. Gooch's vehicle and it was "all over the road." Around that time, Trooper Lake also was notified by radio that Mr. Gooch's driving was observed as being erratic at a toll

---

1. The suit was brought pursuant to West Virginia's wrongful death statute, W.Va.Code, 55–7–6 (1989).

2. Dr. Stout defined rhonchi as a "coarse rattle in the chest" and rales as "a fine sort of crackling noise that you hear in the chest[.]"

booth. Trooper Lake detected Mr. Gooch's vehicle and observed his driving.

In his deposition, Trooper Lake stated Mr. Gooch was traveling 45 miles per hour in a 65 miles per hour zone and was weaving. Upon stopping Mr. Gooch's vehicle, Trooper Lake observed that Mr. Gooch exited his vehicle through the passenger's side, he had thrown up and urinated upon himself, he had slurred speech, and he · had difficulty with balance and coordination. Recognizing these characteristics as indicators of an impaired driver, Trooper Lake administered a field sobriety test which Mr. Gooch failed. In the criminal complaint, Trooper Lake wrote "[t]he defendant stated he had not been drinking but was taking several types of medication." Trooper Lake stated he did not find any evidence in Mr. Gooch's vehicle that he was taking a prescription medication, but he did find an open container of whiskey in the front seat with half of an inch to an inch missing from it and also found another bottle of alcohol which remained sealed.

Based upon Trooper Lake's belief that Mr. Gooch was driving under the influence of drugs or alcohol (DUI), Mr. Gooch was arrested. Trooper Lake testified he asked Mr. Gooch whether he preferred to have a breathalyzer or a blood test. Trooper Lake wrote in the criminal complaint that Mr. Gooch "stated he had a lung disorder [and] would prefer a blood test." Trooper Lake took Mr. Gooch to Raleigh General Hospital to have his blood drawn.

In its brief, the hospital states Mr. Gooch's name was listed in the emergency room log book. However, the hospital maintains that Mr. Gooch was not admitted as a patient and no referral was made for him to see a physi-

cian because Mr. Gooch only was there to have blood drawn for a test to determine if he was DUI. At a deposition, Kimberly Ann Abbott, a medical technologist at the hospital, testified that when the police bring an individual to the hospital for a blood test, the police officer provides the medical technician with a kit that contains everything necessary to perform a blood test except for a tourniquet. Once the blood is drawn, the technician completes a form contained in the kit for the officer and gives both the form and the kit with the blood back to the officer. Ms. Abbott stated the hospital does not perform any type of analysis on the blood and it does not receive the test results. She further explained that her job duties do not include making a patient assessment for medical treatment, but she probably would get someone to check a patient in obvious need. Ms. Abbott had no recollection of Mr. Gooch.[3]

Trooper Lake testified that while they were at the hospital, he was not asked by Mr. Gooch to get him medical treatment. After the .blood was drawn, Trooper Lake took Mr. Gooch to magistrate court to be arraigned. Trooper Lake said Mr. Gooch did not complain about leaving the hospital without seeing a physician. Trooper Lake further stated he did not recall Mr. Gooch requesting any medical treatment during his arraignment. Magistrate T.H. Wills, who arraigned Mr. Gooch, also testified he did not recall Mr. Gooch complaining about a lung disorder, except he did recall Mr. Gooch mentioned he was sipping a little alcohol for his cough and he saw a doctor in Virginia.

After the arraignment, Trooper Lake took Mr. Gooch to the Raleigh County Jail where he was committed at approximately 7:30 p.m.

---

**3.** In an affidavit, Phillip Zsoldos, the Assistant Administrator of the hospital, states:
> "[T]he only record in the possession of the [hospital] . . . of the visit of John Earl Gooch . . . is a notation on the master patient index . . . sometimes called a 'log', recording a visit by John Earl Gooch . . . and containing a notation 'DISP (Disposition) 007' which is the code description showing the patient left without treatment or before treatment was completed. He was not admitted as a patient and was not treated or examined by any of the emergency room physicians on duty or any other medical personnel employed by said hospital.

> "Affiant further stated he is advised blood was drawn from John Earl Gooch by Kimberly Abbott at the request of Trooper S.B. Lake, in whose custody the said John Earl Gooch was at the time of said visit and that said blood was delivered to the said Trooper S.B. Lake, and no charge was made for the services of the said Kimberly Abbott in drawing the said blood and no test was run thereon at [the hospital] and no record was made of the drawing of the said blood."

Trooper Lake completed a Temporary Commitment Form on Mr. Gooch. One section of that form is devoted to the arrestee's medical history. Trooper Lake explained this section is completed based upon answers given by the arrestee at the time the form is completed. On Mr. Gooch's form, it is written that he suffered from high blood pressure. The space for medication is checked "no." There is nothing on the form that would indicate Mr. Gooch was suffering a respiratory illness or was taking any medication for such illness. Trooper Lake stated he did not write down Mr. Gooch's early claims that he suffered from a lung problem and was on medication because Mr. Gooch did not mention them when he was asked the questions on the form. Trooper Lake asserted "it's not uncommon for impaired drivers to offer excuses for why they were driving the way they are or why they were drinking or whatever."

Thomas Scott, the current jail administrator, testified at a deposition that all activities at the jail are recorded in the "Duty Reference Log." Mr. Scott stated if an inmate claims he is sick or in need of medical attention, it is written in the log. After reviewing the log for the time period when Mr. Gooch was incarcerated, Mr. Scott found no indications that Mr. Gooch reported to jail personnel that he made a request for medical attention.[4] It is written in the log that Mr. Gooch was released from the jail the day after his incarceration, June 15, 1990, at 1:20 p.m.

According to the plaintiff's brief, Mr. Gooch continued towards Kentucky after his release and happened upon an automobile accident near Winfield, West Virginia, in Putnam County.[5] Mr. Gooch stopped and was noticed by personnel at the scene as being in distress. Mr. Gooch was taken to Putnam General Hospital where he died two days later, June 17, 1990, of strep pneumonia. The blood test taken at Raleigh General Hospital on Mr. Gooch came back negative for drugs and alcohol.

## II.

### SUMMARY JUDGMENT

#### A.

*When a Summary Judgment Determination is Appealable*

■ The first issue this Court must address is whether either the hospital or Trooper Lake and the DPS have an appealable order. Because there are still aspects of this case pending in the circuit court, our jurisdiction to decide the issues presented in this case must be addressed. Generally, this Court in its appellate capacity only has jurisdiction over final decisions of the circuit court. As we recently explained in Syllabus Point 3 of *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995): "Under W.Va.Code, 58–5–1 (1925), appeals only may be taken from final decisions of a circuit court. A case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined."[6] The purpose of the "rule of finality," as it is known, is "to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]' *United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 3082, 73 L.Ed.2d 754, 756 (1982)." 193 W.Va. at 292, 456 S.E.2d at 19. However, this Court has recognized limited exceptions to this finality principle and, if an order falls within an exception, the order is immediately appealable.

In *James M.B.*, we stated that, in addition to being final pursuant to W.Va.Code, 58–5–

---

4. Mr. Scott further stated that the correctional staff has some fundamental training for dealing with sick or injured individuals. This training includes taking an individual to a hospital emergency room when necessary.

5. Mr. Gooch was not involved in the accident.

6. W.Va.Code, 58–5–1, provides, in part:
    "A party to a controversy in any circuit court may obtain from the supreme court of appeals, or a judge thereof in vacation, an appeal from, or a writ of error or supersedeas to, a judgment, decree or order of such circuit court in the following cases: (a) In civil cases where the matter in controversy, exclusive of costs, is *of greater value or amount than one hundred dollars, wherein there is a final judgment, decree or order[.]"*

1, an order may be appealed if it "fall[s] within a specific class of interlocutory orders which are made appealable by statute or by the West Virginia Rules of Civil Procedure, or ... fall[s] within a jurisprudential exception." 193 W.Va. at 292–93, 456 S.E.2d at 19–20. (Footnotes omitted). We explained in note 3 of *James M.B.*, that "specific issues that arise by writs of prohibition, certified questions, or by judgments rendered under Rule 54(b) of the West Virginia Rules of Civil Procedure" may be addressed by this Court. 193 W.Va. at 292, 456 S.E.2d at 19. We further indicated in note 4 of *James M.B.* an appeal may arise pursuant to the "collateral order" doctrine, a jurisprudential exception.[7] 193 W.Va. at 293, 456 S.E.2d at 20.

The issue presented in this case, therefore, is whether the order, or any part thereof, is appealable under the final order doctrine or one of its exceptions. It is clear that the order taken as a whole is not a "final order" as to all issues and all parties. The order did not "terminate[ ] the litigation between the parties on the merits of the case and leave[ ] nothing to be done but to enforce by execution what has been determined." Syllabus Point 3, in part, *James M.B.* Specifically, the circuit court denied summary judgment in favor of Trooper Lake and the DPS and the issue of whether they are liable for the death of Mr. Gooch remains in dispute.

It long has been the policy of this Court that the denial of summary judgment is interlocutory and not appealable unless it falls within one of the exceptions. We said in Syllabus Point 8 of *Aetna Casualty and Surety Co. v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963):

> "An order denying a motion for summary judgment is merely interlocutory, leaves the case pending for trial, and is not appealable except in special instances in which an interlocutory order is appealable."

*See also* Syllabus, *Wilfong v. Wilfong*, 156 W.Va. 754, 197 S.E.2d 96 (1973) ("[t]he entry of an order denying a motion for summary judgment made at the close of the pleadings and before trial is merely interlocutory and not then appealable to this Court"). The plaintiff in the present case responds to Trooper Lake's and the DPS's brief, in which they argue the circuit court erred when it denied their motion for summary judgment, by claiming it is premature for them to bring such a claim. We agree. As to Trooper Lake and the DPS, the April 19, 1994, order merely is interlocutory and does not fall within one of the exceptions to the "final order" doctrine. Therefore, in adhering to these principles, we decline to entertain Trooper Lake's and the DPS's arguments on this appeal.[8]

---

7. Usually, denial of summary judgment is not treated as final and cannot be appealed until the conclusion of the case on the merits. Under these facts, the only possible exception to the rule would arise where a summary judgment decision finally determines claims of right separable from, and collateral to, rights asserted in the action too important to be denied review and too independent of cause itself to require that appellate consideration be deferred until the whole case is adjudicated. The United States Supreme Court set forth the "collateral order" doctrine in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In note 2 of *Durm v. Heck's, Inc.*, 184 W.Va. 562, 566, 401 S.E.2d 908, 912 (1991), we recognized the *Cohen* exception to federal Rule 54(b). Under *Cohen*, " '[a]n interlocutory order would be subject to appeal under this doctrine if it "(1) conclusively determines the disputed controversy, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Thompson [v. Betts]*, 754 F.2d [1243,] 1246 [ (5th

Cir.1985) ].' (Citations omitted in *Durm* )." *James M.B.*, 193 W.Va. at 293 n. 4, 456 S.E.2d at 20 n. 4.

8. During oral argument, counsel for Trooper Lake and the DPS mentioned two cases which counsel asserted gave Trooper Lake and the DPS the right to make cross-assignments of error in this appeal. These two cases are *W. Bateson & Company v. Baldwin Forging & Tool Co.*, 75 W.Va. 574, 84 S.E. 887 (1915), and *Morgan v. Ohio River R. Co.*, 39 W.Va. 17, 19 S.E. 588 (1894). After reviewing these cases, we do not find either controlling in the present situation. Trooper Lake and the DPS are not proper appellees in this matter because they do not have an appealable order under Rule 54(b). Therefore, Trooper Lake and the DPS may not bring cross-assignments of error as is permitted for an "appellee" under Rule 10(f) of the West Virginia Rules of Appellate Procedure. Rule 10(f) provides:

> "Appellee, if he is of the opinion that there is error in the record to his prejudice, may assign

364

■ Consequently, the issue left to be resolved is if the plaintiff's appeal of the circuit court's decision to grant summary judgment in favor of the hospital is appropriate. We find this part of the order falls squarely within the boundaries of a judgment made pursuant to Rule 54(b).[9] In *Durm v. Heck's, Inc.*, 184 W.Va. 562, 566, 401 S.E.2d 908, 912 (1991), we said: "With the enactment of Rule 54(b), an order may be final prior to the ending of the entire litigation on its merits if the order resolves the litigation as to a claim or a party. *See* W.Va.R.Civ.P. 54(b); Fed.R.Civ.P. 54(b)." We further stated in Syllabus Point 2 of *Durm*:

"Where an order granting summary judgment to a party completely disposes of any issues of liability as to that party, the absence of language prescribed by Rule 54(b) of the West Virginia Rules of Civil Procedure indicating that 'no just reason for delay' exists and 'directi[ng] . . . entry of judgment' will not render the order interlocutory and bar appeal provided that this Court can determine from the order that the trial court's ruling approximates a final order in its nature and effect."

*See also Sisson v. Seneca Mental Health/Mental Retardation Council, Inc.*, 185 W.Va. 33, 404 S.E.2d 425 (1991). In the present case, the April 19, 1994, order granted summary judgment in favor of the hospital and dismissed the plaintiff's action against it with prejudice. Although this order, like the one at issue in *Durm*, did not contain the

language prescribed in Rule 54(b), it clearly ended the litigation on the merits between the plaintiff and the hospital and "approximates a final order in its nature and effect." Syllabus Point 2, in part, *Durm*. Therefore, we hold the circuit court's decision to grant summary judgment in favor of the hospital is ripe for appeal.

**B.**

*The Criteria for Summary Judgment Determinations*

After determining the plaintiff may appeal the circuit court's decision to grant summary judgment in favor of the hospital, we next must examine the criteria upon which granting summary judgment is appropriate. This Court recently has made great efforts to clarify the circumstances upon which summary judgment should be granted or denied. As we briefly summarized in *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), summary judgment under Rule 56 of the West Virginia Rules of Civil Procedure serves an important function in litigation. Its purpose is to bring about " ' "a prompt disposition of controversies on their merits without resort to a lengthy trial," ' if there essentially 'is no real dispute as to salient facts' or if it only involves a question of law." *Williams*, 194 W.Va. at 58, 459 S.E.2d at 335, *quoting Painter v. Peavy*, 192 W.Va. 189, 192 n. 5, 451 S.E.2d 755, 758 n. 5 (1994), *quoting Oakes v. Monongahela Power*

such error in a separate portion of his brief and set out authority and argument in support thereof. Such cross assignment may be made notwithstanding the fact that appellee did not file a separate petition for an appeal within the statutory period for taking an appeal. Appellant may answer the cross assignment of error in his reply brief."

Our decision on this matter does not prejudice Trooper Lake and the DPS if they choose to appeal from a future "final order" or one that falls within one of the exceptions.

9. Rule 54(b) applies to judgments in which there are multiple parties or claims. Rule 54(b) provides:

"When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or

parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

"The rationale behind this rule is to prevent a party from experiencing hardship or injustice as a result of delay by forcing a party to wait until a final judgment is rendered as to all claims and parties. *See Durm v. Heck's, Inc.*, 184 W.Va. 562, 401 S.E.2d 908 (1991)." *James M.B.*, 193 W.Va. at 293 n. 3, 456 S.E.2d at 20 n. 3.

*Co.*, 158 W.Va. 18, 22, 207 S.E.2d 191, 194 (1974). We further explained in *Williams* that summary judgment "is one of the few safeguards in existence that prevent frivolous lawsuits from being tried which have survived a motion to dismiss. Its principal purpose is to isolate and dispose of meritless litigation." 194 W.Va. at 58, 459 S.E.2d at 335.

■■■ In *Williams*, we reaffirmed and more fully explained the parameters of our previous decision of *Painter, supra*, which outlined the basic principles of summary judgment under Rule 56. In Syllabus Points 2, 3, and 4 of *Painter*, we stated:

"2. ' "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

"3. The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial.

"4. Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."

It is clear under both *Williams* and *Painter* that summary judgment is alive and well in West Virginia. However, "this Court will reverse summary judgment if we find, after reviewing the entire record, a genuine issue of material fact exists or if the moving party is not entitled to judgment as a matter of law." *Williams*, 194 W.Va. at 59, 459 S.E.2d at 336.

■■■ We review *de novo* the entry of summary judgment by a circuit court. *See* Syl. pt. 1. *Painter; Williams*, 194 W.Va. at 58, 459 S.E.2d at 335. Thus, "we apply the same standard as a circuit court." *Williams*, 194 W.Va. at 58, 459 S.E.2d at 335. (Citation and footnote omitted). In this regard, our responsibility is not to weigh and determine the truth of the evidence but, after drawing any permissible inferences in a light most favorable to the nonmoving party, to decide if there is a genuine issue for trial. *Williams*, 194 W.Va. at 59, 459 S.E.2d at 336. We articulated the respective burdens of the parties in Syllabus Point 3 of *Williams*, where we stated:

"If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure."

To meet its burden, the nonmoving party must offer "more than a mere 'scintilla of evidence' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor. *Anderson* [*v. Liberty Lobby, Inc.*], 477 U.S. [242,] 252, 106 S.Ct. [2505,] 2512, 91 L.Ed.2d [202,] 214 [ (1986) ]." 194 W.Va. at 60, 459 S.E.2d at 337. "The essence of the inquiry the court must make is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214." 194 W.Va. at 61, 459 S.E.2d at 338. Thus, with the aforementioned standards in mind, we look to the law and facts of the present case to determine whether the circuit court erred when it granted summary judgment in favor of the hospital.

## III.

### HOSPITAL–PATIENT RELATIONSHIP

In part, the plaintiff alleges in the complaint that the hospital is liable for "[f]ailing to recognize that the plaintiff's decedent was

not drunk but on medication for strep pneumonia or at least an illness" and for "[f]ailing to recognize plaintiff's decedent's medical condition while at Raleigh General Hospital for the blood alcohol test." The hospital based its motion for summary judgment on the fact that no hospital-patient relationship existed upon which liability can rest. The circuit court agreed with the hospital and granted summary judgment in its favor. For the following reasons, we affirm the circuit court's decision and find that summary judgment was appropriate.

A central issue to the circuit court's determination is whether the record taken as a whole and in a light most favorable to the plaintiff is sufficient to create a genuine issue of material fact for trial. As we stated in *Rand v. Miller*, 185 W.Va. 705, 706, 408 S.E.2d 655, 656 (1991), "[t]he essence of a medical malpractice action is a physician-patient relationship." Generally, it is axiomatic that unless such a relationship is established a legal duty cannot exist between the parties.[10] Similarly, we find that to maintain an action against a hospital a plaintiff must present sufficient facts to create a genuine issue of whether a hospital-patient relationship existed. Without sufficient evidence of such a relationship, a plaintiff fails to meet an essential element of the case and summary judgment is appropriate.

In *Rand*, we found the facts were insufficient to establish a physician-patient relationship and, therefore, reversed the trial court's order denying the physician's motion to set aside the jury verdict in favor of the plaintiff. The facts of *Rand* involve a physician who was hired by an employer to evaluate prospective employees' medical records. The physician was sued for defamation and malpractice when she gave an unfavorable medical opinion about the plaintiff's mental health which prevented the plaintiff from obtaining work with the employer. The physician argued no physician-patient relationship existed "which would give rise to a duty of care, the breach of which would justify a medical malpractice action." 185 W.Va. at 706, 408 S.E.2d at 656. We agreed with the physician and in the Syllabus stated, in part: "A physician who undertakes to evaluate a prospective employee's medical records for the employer lacks a sufficient professional relationship with the employee to support a malpractice action."[11]

Also relevant to the present case is the language of W.Va.Code, 55–7B–2(e) (1986), which defines a "patient" for purposes of the Medical Professional Liability Act, W.Va. Code, 55–7B–1, *et seq.*, as "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." Based upon the language of W.Va.Code, 55–7B–2(e), and *Rand*, the circuit court concluded in the memorandum incorporated by reference into the April 19, 1994, order:

> "Casual contact with a person, whether or not the contact is associated with a medical context, is not sufficient to imply or establish a professional relationship. The creation of that relationship requires that the parties reach an agreement, express[ed] or implied, that care will be provided. This is consistent with the result in the *Rand* case … and the cases upon which that opinion relies."

Applying these criteria to the facts of the present case, the circuit court found the entry of Mr. Gooch's name in "the Emergency Room log is not evidence that a contractual relationship was created. The entry into the log is often the first step toward the creation of such a contract, but it is by no means the final step." The circuit court further stated that under the facts of this case, "there is no

**10.** An exception to this rule arises when a duty is created by statute. *See note 12, infra.*

**11.** The plaintiff asserts *Rand* is distinguishable from the present case because the physician in *Rand* was hired by a third party for the exclusive benefit of the third party. On the other hand, the plaintiff argues an emergency room exists for the benefit of those who seek treatment, i.e., Mr. Gooch. Although it may be true that an emergency room ordinarily exists to give medical attention to those in need, we find the plaintiff's argument to be a broad over generalization. For instance, as typically occurs in a DUI context, the arrestee is brought to the hospital for the sole purpose of having blood drawn for DUI testing. The arrestee does not receive medical treatment unless such treatment is necessitated by additional circumstances.

basis upon which to conclude that Raleigh General Hospital agreed expressly or by implication to accept Mr. Gooch as a patient, and there is no basis upon which to conclude that Mr. Gooch had expressly or by implication requested such services." Therefore, the circuit court held the plaintiff failed to establish an "essential requisite of a malpractice action[.]"

In support of the action against the hospital, the plaintiff submitted an affidavit from Marshall Salkin, M.D., who claims to have expertise in hospital and emergency room procedures. After reviewing the depositions, pleadings, and medical records, Dr. Salkin opined to "a reasonable degree of certainty that said hospital, though its agents and/or employees, was negligent in its care of Mr. Gooch." Dr. Salkin also averred, in part:

"[A] hospital emergency room should not perform medical procedures such as drawing blood unless a health care provider examines the patient at some time during the visit.

"It is foreseeable that some individuals brought in by the police may be ill, rather than intoxicated. Failure to have a policy requiring a medical check in the face of this is negligence. If such a policy existed, it was clearly violated and the hospital would be negligent.

"Further, regardless of whether an individual is chemically under the influence or ill, he needs to be medically evaluated to determine whether or not he is capable of safely surviving incarceration or whether he is well enough to leave the hospital for any reason. Again, this medical exam was not accomplished in this case, and such is below the standard of care.

"The violations and negligence were at least substantial contributing causes of Mr. Gooch's death." (Emphasis deleted).

In the memorandum incorporated by reference into the April 19, 1994, order, the circuit court stated Dr. Salkin's affidavit may be sufficient to create a factual issue of whether the hospital met the legal standard of care in a malpractice action; however, the question presented to the circuit court was a legal issue, not a factual one, and, thus, "this affi-davit does not, and cannot, address the legal issue."

In making its decision, the circuit court also was guided by *Clough v. Lively,* 193 Ga.App. 286, 387 S.E.2d 573 (1989) (*Clough II*). The underlying facts of *Clough II* are similar to the facts of this case and were set forth in a related decision, *Clough v. Lively,* 186 Ga.App. 415, 367 S.E.2d 295 (1988) (*Clough I*). In *Clough I,* the appellees' son was discovered in a semiconscious state by a police officer in an automobile that struck a utility post. In the automobile was a partially consumed bottle of alcohol and a prescription bottle. The appellees' son was not "'seriously injured'" but was unsteady and had slurred speech. 186 Ga.App. at 415, 367 S.E.2d at 296. The appellees' son told the officer he had consumed two of the prescription pills. Believing him to be intoxicated, the officer took the appellees' son to the hospital. At the hospital, a registered nurse drew the appellees' son's blood, checked his vital signs, and made a diagnosis of his condition. He then was released and taken by the police officer to jail. Shortly after arriving at the jail, the appellees' son lapsed into a coma and later died. 186 Ga.App. at 416, 367 S.E.2d at 296.

In *Clough II,* the Georgia Court of Appeals reversed the lower court's denial of the motion for summary judgment made on behalf of the nurse and the hospital. In opposition to the motion for summary judgment, the appellees submitted an affidavit of a physician who specialized in emergency medicine who concluded after reviewing the records that the nurse "deviated from accepted nursing practices and standards in failing to notify the emergency physician ... and in permitting [the appellees' son] to leave the emergency department in an unimproved condition." 193 Ga.App. at 287, 387 S.E.2d at 574. The appellees argued that the nurse and the hospital accepted their son as a patient but failed to correctly diagnose or treat him which resulted in his death.

On the other hand, the nurse and the hospital maintained that no patient-health care provider relationship was established. In that respect, the court of appeals found the appellees' son declined to receive medical

treatment when the nurse asked him if he needed or desired it. In addition, the nurse claimed "that her involvement on behalf of [the hospital] was solely for the purpose of compliance with the officer's written request that a blood sample be taken[.]" 193 Ga. App. at 287, 387 S.E.2d at 574. In agreeing with the nurse and the hospital that a patient-health care provider relationship did not exist, the court of appeals stated:

"The general rule is that in the absence of a patient-health care provider relationship (and the duties arising therefrom) there can be no liability for medical malpractice.... The patient-health care provider relationship is a consensual one wherein the patient knowingly seeks the assistance of a health care provider.... Thus, as the uncontroverted evidence shows that [the appellees' son] declined to enter into a patient-health care provider relationship any broader than necessary to accomplish the drawing of a blood sample, no relationship was created which gave rise to the level of professional duty advocated by appellees." 193 Ga.App. at 287–88, 387 S.E.2d at 574–75. (Citations omitted).

The court of appeals rejected the appellees' argument that the hospital by agreeing to draw their son's blood "consented to an unbounded relationship with [their son] and thus were obliged to use due care to recognize [his] need for treatment." 193 Ga.App. at 288, 387 S.E.2d at 575. Instead, the court

of appeals found that neither the nurse, the hospital, nor the appellees' son "consented to such a relationship and there is clearly no reason that the parties to such a relationship may not specify its parameters." 193 Ga. App. at 288, 387 S.E.2d at 575.

The plaintiffs state *Clough II* is distinguishable from the present case on the grounds that in *Clough II* the appellees' son specifically was asked and declined medical treatment. Contrary, the plaintiff maintains that in this case Mr. Gooch was never offered or declined medical services. In fact, the plaintiff asserts that given Mr. Gooch's condition, it is a factual question whether Mr. Gooch had the capacity to decline treatment. However, as held by the circuit court, prior to reaching the duty of care issue, the plaintiff must first establish there was a hospital-patient relationship.

After reviewing the facts of this case, we agree with the circuit court's conclusion that such a relationship was not established upon which liability can be based. To establish a hospital-patient relationship, unless otherwise imposed by law,[12] there must be a "natural person who receives or should have received health care from a licensed [hospital] under a contract, expressed or implied." W.Va.Code, 55–7B–2(e). As a matter of law, we hold that a hospital-patient relationship cannot be created merely by virtue of an arrestee being presented to a hospital for a drug and alcohol blood test. To

---

**12.** For example, Congress passed the "Examination and Treatment for Emergency Medical Conditions and Women in Labor" under the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985. 42 U.S.C. § 1395dd (1990). In large measure, this section was enacted to prevent the increasing problems associated with "patient dumping" of indigents. In response to this problem, 42 U.S.C. § 1395dd(a), states:

**"Medical screening requirement**
"In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emer-

gency medical condition (within the meaning of subsection (e)(1) of this section) exists." If 42 U.S.C. § 1395dd is violated, subsection (d)(2)(A) permits an individual to pursue damages for personal harm. This subsection specifically provides:
"Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate."
For further discussions with regard to 42 U.S.C. § 1395dd, see James P. McHugh, *Emergency Medical Care for Indigents: All Hospitals Must Provide Stabilizing Treatment or Pay the Price*, 93 W.Va.L.Rev. 165 (1990); Karen H. Rothenberg, *Who Cares?: The Evolution of the Legal Duty to Provide Emergency Care*, 26 Hous.L.Rev. 21 (1989).

avoid summary judgment, a plaintiff must show sufficient additional evidence beyond the presentation for a DUI blood test to demonstrate either an expressed or implied contract between the parties was created.[13]

In the present case, there is no evidence in the record that the hospital had knowledge by being told either by Mr. Gooch or Trooper Lake that Mr. Gooch claimed he was ill and not under the influence of drugs or alcohol. The only evidence to support the plaintiff's contention that Mr. Gooch, nevertheless, should have received health care from hospital personnel is based upon the fact he actually was ill when he was taken to the emergency room. However, we do not find anything in the record that would suggest Mr. Gooch's appearance was inconsistent with being under the influence or that otherwise would permit a rational trier of fact to conclude hospital personnel knew or reasonably should have known he was ill.[14] Moreover, we find no evidence that either an expressed or implied contract was formed between the parties. Therefore, we conclude the circuit court properly entered summary judgment in favor of the hospital on this ground.

 Although it is not addressed in the circuit court's order, an additional reason we find that summary judgment was appropriate is because W.Va.Code, 17C–5–6 (1981), specifically provides civil immunity to institutions and individuals who draw blood at the direction of a police officer unless there is "gross negligence or willful or wanton injury." W.Va.Code, 17C–5–6, more fully states, in part:

"No person who administers any [blood test] upon the request of a law-enforcement officer as herein defined, no hospital in or with which such person is employed or is otherwise associated or in which such test is administered, and no other person, firm or corporation by whom or with which such person is employed or is in any way

associated, *shall be in anywise* ... civilly liable in damages to the person tested unless for gross negligence or willful or wanton injury." (Emphasis added).

During oral argument, counsel for the plaintiff conceded that he does not have sufficient evidence to show "gross negligence or willful or wanton injury" on the part of the hospital. Thus, under the facts of this case, the hospital is immune from suit.[15]

## IV.

### CONCLUSION

For the foregoing reasons, we affirm the August 1, 1994, order of the Circuit Court of Raleigh County denying the plaintiff's motion to reconsider the April 19, 1994, order which granted summary judgment in favor of Raleigh General Hospital. As a matter of law, we find the circuit court properly entered summary judgment in favor of the hospital. We decline to address the issues raised by Trooper Lake and the DPS.

Affirmed.

---

13. We recognize there are situations in which an expressed or implied contract could be formed between an arrestee and a hospital. For instance, a contract could be established if hospital personnel provide treatment either upon the arrestee's request or because they otherwise recognize the need to provide such treatment.

14. This case is unlike those situations in which a person goes to an emergency room specifically seeking treatment and hospital personnel are aware of that fact.

15. We explicitly decline to address the extent W.Va.Code, 17C–5–6, would protect an institution or an individual from civil liability if action was taken beyond the mere drawing of blood.